Good morning, Your Honors, and may it please the Court, Sarah Weinman and Federal Defenders of San Diego, on behalf of Ramon Valencia-Cruz. Walking up to the Port of Entry and presenting ID that legitimately belongs to you cannot constitute an attempted illegal reentry offense. This Court, in Arguello-Rosales, held that Congress did not intend to make criminals out of people who, for innocent reasons, may approach the immigration officials at the border. I'm having a little trouble. I agree with your opening statement, but this individual on, I don't know, six occasions or more, had notice, correct? Yes and no, Your Honor. He's being deported. He's told you can't come back in. Coming back in would be illegal. So he happens to have this piece of paper, but maybe something's escaping me. But after that many times of being sent back home and told this, I'm just having some trouble with your argument. So tell me, what is the narrow area in which you think he can, I don't want to say sneak through, but find himself in? Sure, and I appreciate the opportunity to clarify because this record is not only a little bit complex in terms of how things transpired over the previous decade, but I think also important to keep in mind that it's extremely unusual. What happened here was he was ordered removed by an immigration judge in 2008, and thereafter DHS expeditedly removed him a couple of times. One year later, in 2009, the Department of Homeland Security sent him a lawful permanent resident card. It was his own card. It featured the seal of the United States government. It had his picture, his fingerprints, and it had an expiration date of 2019. Even by the testimony of the agents in this case, that was a facially valid card. So a few months later, two other things, sorry, I want to point out. In 2008, the warnings he received from the IJ said you can't come back for 20 years. I'm sorry, you cannot come back. It was a permanent bar, but you can reapply for admission despite the bar. The expedited removal in 2008 then said he had a 20-year bar, not a permanent bar, also said he could reapply for admission. So DHS sent him the permanent resident card the following year. A few months later, he approached the port of entry, presented that card, submitted to inspection and examination at the port of entry, and was permitted to enter. Did he know something that he could at least suspect the person who sent him the permanent card didn't know? I don't believe so, Your Honor. It was a co-equal branch of the Department of Homeland Security. There had been, you know, he had been told that he was removable and had been removed on the basis of a prior conviction, but now he's also being told not to come back. He was told he had a permanent bar and that he could also apply for admission. And then he was told he had a different bar and that he could apply for admission. And then he gets this card indicating that he had permission to come back. And he did come back and was allowed in. So I think whatever, what's important here, and I think considering the broader scope of the court's holding in this case, is that Mr. Valencia Cruz may have thought this card might not be good, right? He had been removed before they sent him this card. He didn't know if it was good or not. He came to the port of entry once. He showed that card. They let him in. He came to the port of entry again. He wasn't trying to sneak in. He wasn't jumping a fence. It wasn't a counterfeit ID. But what about in 2017? Don't they arrest him? They basically, he's told that he's in the country illegally. At that time, he pleads guilty. He gets a short sentence and he's removed to Mexico. That's correct, Your Honor. So do we just, the issue here really is whether any rational trier of fact could figure or would believe, in fact, he was in violation of the law. But we can't discount the 2017 evidence, can we? No, and I think the 2017 evidence is important for a couple of reasons. So he had been, first of all, he was convicted in that case of being found in. That means remaining in without authority, right? And then when he was reinstated, when the... But if he's here, if he's found in the United States without authority, isn't that a little tip off that he doesn't have legal authorization to be here? He was told that, again, he was picked up on an old warrant and removed. So it's similar in a way to what happened in 2008. He was removable. But that's different than being told that he can't come back. And what happened in the reinstatement proceedings that followed is he, unlike the prior removal orders he'd received, he didn't get any warnings. So now we have a situation where he's at first told permanent bar and then 20-year bar. Now no bar to coming back in. And I think another important fact to bear in mind is that they didn't seize his card. We have... Why didn't they seize his card? I cannot tell you the answer to that. What I can tell you, and I can point to the record in this case where the agent, and I'm He must have thought he just hit the lottery. I mean, he has signed so many papers saying, I am not permitted to come back in without the express consent of the Attorney General. He never seeks Attorney General help, ever, ever. He never does. He gets this card, wow, I get to come back into the country. Big mistake on the government's part. It works. But then he gets caught with the card, five-month sentence, and sends back to Mexico. And then he comes back. And in this wonderful scene where he has a bottle of tequila and the card at the border, where are you going? Las Vegas. He must have thought he hit the lottery. And he never got the express consent. And he just figured, I'll give it another try, right? I think that he did think, let me give it another try, because he had gotten mixed messages. And I think what... Well, I mean, so he says, basically, okay, I'm on the way to Las Vegas, I'll roll the dice on one more time, maybe I'll get in. But we're not here kind of de novo. We're here after a trial. The jury got to hear all this. And they could understand that maybe the government had made a whopping error. And maybe they should have charged that against the government and said, not guilty. But they didn't. So what is it that makes the verdict so impeachable or so incredible that we should tip the verdict? Because I think you have to look at two things that happened here before the jury. First of all, the intent that they were told to find, the intent they were instructed on, was not an intent to defraud. It was intent to go at large and at will in the United States, which he had. And it was the intent to enter without consent, which he had. And so then we have to... So we have a guilty mind here under the law. And the government's argument in this case appears to be that that's enough, that that's enough for an attempted reentry. And I guess I would point you to really fundamental principles of criminal law, which are that that's not enough, that you can't punish a thought crime. There also has to be a substantial step. And it has to be a substantial step toward consummating the offense, in which in this case is an illegal reentry. Now if you follow... And being at the pedestrian bridge with this bottle of tequila and the card saying, I'm going to Vegas, isn't a substantial step? Not toward committing an illegal reentry because the agency here has the authority at the port of entry, the designated port of entry, following proper protocols to say, no, we're denying you admission. We're voluntarily removing you. We're expeditedly removing you. You are inadmissible. You cannot come in. Or they could admit him. And what he said... He did roll the dice. He didn't know. He thought this might not be good, but it might be good. I will present it for inspection. I'm not jumping the fence. I'm not using a counterfeit ID. I mean, I think if I could use an analogy, and I do want to reserve a bit of time, but you have a Starbucks card and you don't know if it's got money on it or not. You think it may not, but you go and you present it to the cashier thinking, they'll let me know if there's money on here for a coffee. You're not walking up to the, you know, pickup order and taking the coffee. You haven't had a notice from Starbucks that you can't come in the store. I think in this case, we have to look at, he was told he was removable. He was told that there was a process for coming back in. He followed the proper process for seeking admission. Nor had he gotten a notice from Starbucks that his card was expired, whereas here he knew that he didn't have proper authority from the government. And you're saying that knowledge isn't enough, but when you have the knowledge you admitted that he had, and then the physical effort to come through with his card, doesn't that give him the plus factor? I think if the court held that way, what that would mean was that anybody who came to the port of entry thinking, I have this visa, I don't know if it's good or not. I've been told that it might not be good, but here it is, and it looks okay, and I want to try to come in. I want to go at large and at will, and I'm submitting myself to inspection and examination. If this court holds the way the government would have you hold, that person is criminally culpable for essentially what I think we can agree is morally innocent conduct. And again, in our Guero Rosales, the court recognized that Congress simply didn't intend the reach of 1326 to extend that far. But you keep ignoring the fact that when he's been deported on previous occasions, he has I know I am not permitted to come back into the country, one time for life, one time for I don't know, you'll have to go through them for me, 20 years or five years, without the Attorney General, without seeking permission of the Attorney General, and he knows he has never sought the permission of the Attorney General. Except, Your Honor, if I could just respond. This court in Gracidas, Ulubarri, this court on Bonk recognized that there are means and that there are, within a specified period of time after removal, you can seek that consent at the port. And in Gracidas, Ulubarri, it said that there are certain waivers. And so you're saying that's what he was doing? I'm saying that he was following the proper procedures to seek admission. You mean he was just coming in to apply for consent? Pardon me? He was just coming in to talk to the Attorney General, to get the Is that what you're saying? Yes. I am saying he was following the proper procedures to seek entry. And if you're following the proper procedures to seek entry in Mr. Valencia Cruz's unusual circumstances, or in the circumstances of someone else who, you know, is seeking protection, who is... Well, it might be a little different if he'd said, you know, here's my card, and I would like to, of course, speak with the Attorney General. But I know he's not here, so I'd like to speak with someone else, because I'd like to get his permission to enter. Well, that's not what he does. He hopes that things will go well, and they don't go well. But if you look at ER 79, I mean, assuming the port officer is the agent of the AG, he submits himself to that person, and that agent asks him two questions, and he answers those questions honestly. Where are you going? What are you bringing? And then says, give me your card, which he does. And that card gets scanned, and he's denied, you know, he's determined to be inadmissible. All right. Do you want to... We'll give you a little time for rebuttal. Yeah, I'm sorry. Okay. No problem. Thank you. Molly, do you have another? Good morning. May it please the Court, Mark Rahe for the United States. Your Honors, there should be no doubt on this record that this defendant knew when he presented that replacement LPR card in January 2018 that it was not valid, and it would not give him any right to come into the United States. Why didn't they take it away when they sent him back for the five months? That's when they used it improperly the first time, right? That is the million-dollar question, Your Honor. I wish I knew, too. They asked the agent. He said he didn't know. I've been with the U.S. Attorney's Office, San Diego, for 19 years. I've never seen a case like this. So this is... He must have just thought, hey, this is the greatest day of my life. I got... I hit the lottery. I'm going to use it again. It worked once, five months. That wasn't so bad. I'll do it again. And I can understand that, in 2009 when he gets the card, and then in 2010 when he's able to use it successfully. But I would say even... You don't even need to look at all the history of the deports. Just go back the three months before this incident, and I believe the panel's already touched on this. October 2nd of 2017, under oath, during his guilty plea colloquy for 1326 offense, this is an excerpt of Record 73, he admits that he has no proper permission or authorization to return to this country. Five days later, he's deported. Three months later, he shows up at the port of entry, and he suddenly thinks something's changed. That is not a rational inference, and that is certainly not an argument that this jury accepted. And, you know, I know my opponent uses a phrase a lot that he followed the proper process for admission. You know, I would take some issue with that, only to the extent that, sure, he walked through the port of entry, he looked at the immigration inspectors, he answered their question. But by presenting an LPR card, which he knows is no good, he is representing that he has a right to be here. In fact, in excerpt of Record 175, if you look at the back of the card, it says, quote, the person identified by this card is authorized to work and reside in the U.S., end quote. That's an entirely false... I mean, other than the fact that he doesn't mouth those words, by presenting the card, he's effectively making that representation. Well, you would really turn it on its head. You would say, no, he's not making it. The card is making it, and the card was issued by the U.S. government, perhaps ineptly, but that's what the card says, and that's the government issued it, and he's in possession of it. That's her argument. Right. But if that were the end of the record, maybe there might be some traction of that, but you cannot ignore that that three months before, and I know the panel touched on that, I mean, that's a solemn proceeding for him to take a conviction and to swear under oath that he has no permission, and that's seven years, eight years, after he received that card. So even if, yes, I agree, it probably felt like the jackpot when he came back, he knows and he was able to use it once, but then he took a conviction for it. I mean, there's no question that that card's invalid legally. There was testimony by a CBP officer below, and I think that's in excerpt of Record 23, when an alien's ordered removed by an immigration judge, he loses his LPR status, and even at excerpt of Record 13, defense counsel at trial in opening statement admitted that the LPR card, quote, was actually no good, end quote. So you know, they made a good effort before the jury. It's funny, when I was reviewing this case again the last few days, I thought, you know, maybe this jury wanted to send a message to the government, they could have punished us, they didn't, and the question now is under the liberal lens of sufficiency review, you look at the evidence in the light most favorable to the verdict, and I think here that the conviction has to stand. And just a couple other points I want to make. Well, you made two mistakes. You gave them the card in the first place, and then you didn't take it away in the second place. So there was actually two times that the government messed up there. True. But again, you know, after that, I think it leaves no shadow of a doubt, and at least they did take the card the last time. But two other points I wanted to apply or to address, you know, I know my opponent makes kind of a policy argument, too, that this somehow is going to, you know, prohibit innocent conduct, and what about a visa holder? A lot of those hypotheticals are not at issue here. This is an 8 U.S.C. 1326 prosecution. This means somebody, by definition, has to have a prior deportation. This is not just somebody who's, you know, looking for a visa, it's somebody that's already been put through the system and knows, they're imputed with knowledge of the law that they can't return without consent. So, you know, to the extent there's any concerns from the court about that, I want to allay them. And in fact, I think Judge Ferris, you know, you pointed it to it as well. You know, this could have been that case. It wasn't. When he came to the port of entry, you review the record again, you know, Exit Record 79, he says he's going to Las Vegas, and he has his bottle of tequila. At no point does he say, hey, I have some questions about this. Even after he's sent to secondary, he doubles down. You know, at Excerpt of Record, I believe it is 108, he continues to say he's an LPR. And very significantly, this is at Excerpt of Record 101, he lies about never having been deported before. If this is somebody who's acting innocently and really has no idea what's going on, and who had just been deported three months earlier, as the sixth deportation in his life, he would have had no reason to lie. So, you know, on the facts here, there's no question that when he came to the port of entry, he wasn't confused. He wasn't seeking official assistance. And, you know, there really is no, and that goes to, you know, the argument that, sure, even if we assume that there are somehow these waivers at the port of entry, he certainly wasn't going there asking for help. The record disproves that. So I think here, again, under the liberal standard, looking at the light most, you know, favorable to the verdict, a reasonable jury heard all of this evidence, the defense put up their theory. They reasonably found, with three months earlier pleading guilty and being deported, that this defendant knew that this card was invalid. And if that's not a substantial step towards a legal entry, it's hard to think what is. And actually, the very last thing, my opponent cited a case in her reply brief, Zavala-Mendez, 411F3rd, at, I think, 1120. There, it was a found-in case, but the court made a comment. If he had lied about his green card, he could have been charged with attempted reentry, but that wasn't the charge in that case. And I understand that's dicta, but that's something that my opponent featured heavily in her brief. We would say, how is this any different? Sure, on one hand, I think in that case, the person verbally said, I have a green card when he didn't. Here we have a defendant who presents a green card, which says he has the right to be here. That's deceptive conduct. So unless the court has any further questions, the government would submit. Thank you. Thank you. You put a minute back on the clock. We let you go a couple minutes extra already, but I want to give you some time for rebuttal. I just want to make two quick points. Counsel just stood up here and said he knew, and if that's not a substantial step, what is? That can't be right. The government is singularly focused on his intent here, but what we're talking about is substantial step. And the government is looking at these post-arrest statements. He's already been told he's been arrested for illegal reentry, and he says no prior deports. I don't think that you can take that into consideration. The crime at that point was complete. Well, what is, in your view, the precise legal questions before us? All those facts questions have been handled. You had a trial. The verdict came out against him. And what's the legal question before us? The legal question before you is, can a person who presents his true identity, his true identification at the port of entry for inspection and examination by an immigration officer at a designated port, have committed a substantial step toward consummating the offense of illegal reentry? That's the precise legal question. And what did the verdict say? You see, we've got, it seems to me, that's a fact question. Jury answers it. And now you want us to override the jury finding. And on what basis do we do it? Tell me what was wrong. What is the legal question that should cause us to set aside the jury verdict? The legal question is that a person who follows the proper procedures cannot have committed an unlawful entry, and that entry is a term of art, a legal term of art. And that fact question was answered by the jury in the wrong way, and that's what we're putting before this court. And I just want to make one other point quickly to clarify what we're not saying here. We're not saying that because he had this card, that because the government didn't take it away, because they made a mistake giving it to him in the first place, that he should be allowed in the country. We're not saying let him in because he has this card. The agency has full authority to send him back, say, go back to Mexico, you cannot come in with this card. And by the way, we're taking it this time. What we are saying is that this person cannot be held criminally liable for attempted reentry. And this court has recognized that that is far beyond the bounds of what Congress intended. Thank you. Thank you. I think we have your point in mind. The case just argued is submitted. Thank both counsel for the argument this morning.
judges: Farris, McKeown, Kendall